J-S65030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RUDOLPH CHURCHILL | : | |
| | : | |
| Appellant | : | No. 2280 EDA 2016 |

Appeal from the Judgment of Sentence May 2, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0007442-2014,
CP-51-CR-0007443-2014

BEFORE:  OLSON, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    **FILED JANUARY 30, 2018**

Rudolph Churchill appeals from the judgment of sentence imposed on May 2, 2016, in the Court of Common Pleas of Philadelphia County.  On May 2, 2016, a jury found Churchill guilty of two counts of murder of the first degree,[1] and two counts of possession of an instrument of crime,[2] in connection with the March 1989, death of Ruby Ellis, and the April 1989, death of Cheryl Hanible, and the trial court sentenced Churchill to two consecutive life terms.  In this appeal, Churchill challenges the sufficiency of the evidence, the weight of the evidence, and rulings of the trial court during the cross examination of Detective Jeffrey Piree.  We affirm, based upon the trial court's sound opinion.

---

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 907(a).

The trial court has extensively detailed the procedural history and facts of this case, and further discussion is unwarranted. *See* Trial Court Opinion, 11/29/2016, at 1-21. Therefore, we proceed directly to the issues raised in this appeal.[3]

Churchill presents three questions, as follows:

I. Was the evidence sufficient to sustain [Churchill's] convictions where no physical evidence conclusively established that [he] was the perpetrator and where the only evidence identifying him as the murderer – the testimony of a jailhouse informant who suffered from visual and auditory hallucinations – was so unreliable that it rendered the verdicts insufficient as a matter of law?

II. Were the verdicts against the clear weight of the evidence where: (1) the only testimony implicating [Churchill] in the killings came from a jailhouse informant with numerous convictions and a documented history of mental illness, who reported that he was experiencing hallucinations and delusions shortly before he implicated [Churchill] in the crime; (2) the DNA evidence was too tenuous to implicate [Churchill] in the killings of Ruby Ellis or Cheryl Hanible; and (3) the Commonwealth lost and/or did not test other evidence including but not limited to a ligature, both rape kit slides and a cloth covering Ruby Ellis' body?

III. Did the trial court err in prohibiting defense counsel from cross-examining the only available detective from the original investigation regarding the investigation into other suspects and/or victims?

Churchill's Brief at 4.

_____

[3] Churchill timely complied with the order of the trial court to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

- 2 -

The trial judge, the Honorable Rose Marie DeFino-Nastasi, has authored a comprehensive opinion, disposing of all aspects of Churchill's claims. **See** Trial Court Opinion, 11/29/2016 (finding, *inter alia*: (I) Sufficiency of the Evidence: (a) The veracity of the testimony of Richard Simmons, the jailhouse informant, who was extensively cross examined regarding his prior convictions and history of mental illness, was for the jury to decide; (b) DNA testing conclusively established Churchill was the source of the DNA on the paper towel with dark brown stain collected from the floor of the back seat of the vehicle in which Ms. Ellis' body was found; jury heard defense counsel's explanation that the abandoned vehicle was frequented by drug-users and prostitutes, and was free to disbelieve the defense theory that Churchill's DNA was coincidentally at the crime scene; (c) DNA testing established Churchill was the major contributor of the DNA collected from the heel of Ms. Hanible's left sneaker, which was missing the shoelace that was used to strangle her; assuming the jury believed the Commonwealth's expert, it was reasonable for the jury to conclude that Churchill held Ms. Hanible's sneaker by its heel, removed the shoelace, and wrapped it around her neck; jury heard defense counsel's explanation that the abandoned, burned out bar where Ms. Hanible's body was found was frequented by drug-users and prostitutes, and was free to disbelieve the defense theory that Churchill's DNA was coincidentally at the crime scene; (II) Weight of the evidence:  The jury was free to credit the testimony of the jailhouse informant and the evidence of Churchill's DNA found

on the paper towel near Ms. Ellis' and on Ms. Hanible's left sneaker; court's sense of justice was not shocked by fact that there were other items of trash in the vehicle where Ms. Ellis' body was found, by fact that there was a mixture of skin cells on the heel of Ms. Hanible's left sneaker, and by fact Commonwealth did lose and/or did not test other evidence the fact that the Commonwealth did not test and/or lost certain items; and (III) Cross-Examination of Detective Piree[4]: The court ruled that since this incident occurred 27 years ago and many of those interviewed were not locatable, the court would allow the defense some leeway to show there were other leads investigated in the case and Churchill's name was never mentioned in the original interview; counsel took full advantage of the court's ruling, elicited hearsay responses before the jury, pursued an extended line of questioning regarding persons of interest, and was not prohibited from cross-examining regarding the existence and investigation into other suspects and/or victims.

---

[4] Churchill has waived his argument concerning questioning of Detective Piree about James Johnson's discovery of Ms. Ellis' body by failing to include this claim in his Rule 1925(b) concise statement. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [Rule 1925(b)] Statement … are waived."). In any event, while the trial court sustained the Commonwealth's objection to the use of Mr. Johnson's name, the trial court permitted cross examination regarding whether Detective Piree had interviewed Mr. Johnson (who was not referred to by name), whether any other police officer had questioned Mr. Johnson after he provided a statement, and whether he should have been questioned. *See* N.T., 4/26/2016, at 23-25.

Based on our review, we find the arguments of Churchill present no basis upon which to disturb the judgment of sentence. Accordingly, we affirm, based upon the trial court's thorough, well-reasoned opinion of ~~the Judge~~ DeFino-Nastasi.[5]

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/18

---

[5] In the event of further proceedings, the parties are directed to attach a copy of Judge DeFino-Nastasi's November 29, 2016, opinion to this memorandum

FILED

OCT 11 2017

Office of Judicial Records
Appeals/Post Trial

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**

**CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0007442-2014 |
| v. | : | CP-51-CR-0007443-2014 |
| RUDOLPH CHURCHILL | : | 2280 EDA 2016 |
| | : | |

CP 51-CR 0007442 2014 Comm v CHURCHILL RUDOLPH
Opinion

8014567111

**OPINION**

Rose Marie DeFino-Nastasi, J.

**PROCEDURAL HISTORY**

On May 2, 2016, Defendant was found guilty after a jury trial, presided over by the Honorable Rose Marie DeFino-Nastasi, of two counts of First Degree Murder, 18 Pa.C.S § 2502(a), each a felony of the first degree; and two counts of Possession of an Instrument of Crime (PIC), 18 Pa.C S. § 907, each a misdemeanor of the first degree. Defendant was sentenced to two consecutive life terms.

On May 8, 2016, Defendant filed post-sentence motions, which were denied without a hearing on July 13, 2016

On July 17, 2016, Defendant filed the instant appeal to the Superior Court.

On August 22, 2016, Defendant filed a Rule 1925(b) Statement of Matters Complained of on Appeal, pursuant to an Order of the court, claiming that:

1. The evidence was insufficient to sustain the jury's verdict of guilt on all charges as no physical evidence conclusively established that the Defendant was the perpetrator and the only evidence identifying him was the unreliable testimony of a jailhouse informant.

1

2. The verdict was against the weight of the evidence because: the only testimony implicating the Defendant in the killings came from a jailhouse informant with numerous convictions and a documented history of mental illness; the DNA evidence was too tenuous to prove murder as it was single source blood on a napkin in an abandoned car full of trash in one case, and mixture skin cells on a shoe in the other case; and the Commonwealth lost and/or did not test other evidence, including, but not limited to, one ligature, both rape kit slides, and the cloths covering the bodies.

3. The trial court erred in prohibiting defense counsel to cross-examine the detective from the original investigation regarding the existence and investigation into other suspects and/or victims, including, but not limited to: the statement of Delores Holland regarding Cheryl Hanible; Deatrice Terry's prior statements; Samuel Terry's prior statements; "J.C." who had blood on his pants and sent Samuel Terry upstairs in the bar alone; Mayvette Carter's prior statement; and Zetta Craig, who was attacked in the same bar as one of the victims by a male who did not fit the Defendant's description.

## FACTS

The Philadelphia Police Department Office of Forensic Science received a grant to research, evaluate, and analyze cold cases to determine if advancements in DNA testing would enable retesting of evidence containing DNA to develop DNA profiles in order to aid in the identification of perpetrators of cold cases. N.T. 04/22/16 at pp. 63, 75-77. Evidence in the March 1989 murder of Ruby Ellis and the April 1989 murder of Cheryl Hanible was reanalyzed as part of this grant. *Id.*

2

The Defendant became a suspect in both murders after a match was made in the Combined DNA Index System (CODIS) between his DNA[1] and DNA evidence obtained at both crime scenes. N.T. 04/28/16 at pp 16-19. He was located in Paulsboro, New Jersey Buccal swabs were taken from him pursuant to a search warrant on August 1, 2013. After the results of the DNA testing were received, an arrest warrant for the Defendant was prepared. The Defendant was arrested on the 1300 block of Spring Garden Street on March 19, 2014. *Id* at pp. 7-9.

Decedent Ruby Ellis was a dark-skinned, African American female with short black hair. She was 19 years old, 5 feet, 3 inches, 96 pounds. She had been using drugs and was working as a prostitute at the time of her death in North Philadelphia. Her naked body was found in the backseat of an abandoned vehicle on the 1500 block of West Flora Street on March 17, 1989. A blanket was covering a portion of her body Her head was exposed. She had two bruises on the left side of her neck. The cause of death was ligature strangulation. The manner of death was homicide. Ms. Ellis had been strangled with a piece of twine, which was wrapped around her neck four times and tied in a knot near center of her throat. Rectal swabs showed the presence of sperm

Decedent Cheryl Hanible was a dark-skinned, African American female with short black hair. She was 33 years old, 5 feet, 4 inches, 127 pounds. She had a history of drug use and was working as a prostitute at the time of her death in North Philadelphia. On April 23, 1989, Ms. Hanible's partially-decomposed, half-naked body was found in an abandoned, burned-out bar near the 1300 block of Girard Avenue, four blocks from where Ms. Ellis's body was found. A blanket was covering a portion of her body. Her head was exposed. She had two abrasions on the left side of her neck. The cause of death was ligature strangulation. The manner of death was

---

[1] The Defendant's DNA was in CODIS as a result of a 2004 conviction for burglary in Georgia N T. 04/22/16 at pp. 6-11. This evidence was not presented to the jury.

3

homicide. She had been strangled with one of her shoelaces, which was wrapped around her neck three times and tied in a knot near the center of her throat. Rectal swabs showed the presence of sperm.

Philadelphia Police Detective William Kelhower, Homicide Unit, became involved with the reinvestigation into the deaths of Ms. Ellis and Ms Hanible in 2013. N.T. 04/27/16 at pp. 3-7. He testified that records showed that the Defendant was stopped on 16th and Spring Garden Streets on May 15, 1989. He provided the address of 1360 Ridge Avenue as his residence. *Id* at pp 15-16. Records also showed that the Defendant had addresses in California, Pennsylvania, New Jersey, and Atlanta, Georgia *Id.* at pp. 20-21.

Richard Smith testified that he met the Defendant around April of 2014 at Curran-Fromhold Correctional Facility. N.T. 04/26/16 at pp. 115-17. They were housed in the same block and pod *See* N.T. 04/27/16 at pp. 12-14. The Defendant told him about two murders he committed when he was working as a "hustler" in Philadelphia and stated that he would not have gotten caught had he not been required to give a DNA sample when he was in Georgia. N.T. 04/26/16 at pp. 120-24. "He said one [of the murders] was [committed] outside and one was inside." *Id* at p. 122. The Defendant took one of the girls, who was a prostitute, "into the spot, the inside of some building." *Id.* at pp. 118, 121-22. "Some things had went bad, and she scratched him and he lost control of himself." *Id.* at p. 122.

### *Murder of Ruby Ellis, CP-51-CR-0007442-2014*

On March 17, 1989, at approximately 4.50 a.m., Philadelphia Police Officer Leoda Gibson was assigned to investigate a crime scene near 1508 West Flora Street. N.T. 04/21/16 at pp. 44-46 When she arrived, she observed nineteen-year-old Ruby Ellis's body in the backseat

4

of an abandoned Oldsmobile parked in a lot with other abandoned vehicles on the 1500 block of West Flora Street. *Id.* at pp. 44-52.

The back passenger's side door of the vehicle was partially open when Officer Gibson arrived on the scene. *Id.* at p. 54. Ms. Ellis was nude with a blanket covering a portion of her body. Her head was between the door and the backseat of the vehicle. *Id.* at pp. 63, 67-68. A pair of jeans was lying on the backseat. *Id.* at p. 68. A green cloth was partially draped over the back of the vehicle. *Id.* at pp. 60-61, 68.

Retired Philadelphia Police Officer James Caldwell, Crime Scene Unit, testified that the following items were recovered from inside of the Oldsmobile at the time of the discovery of the decedent in 1989: one pair of size six (6) work boots from the front seat area; a large piece of brown fabric from the rear seat area; one white and pink woman's nightgown from the left rear floor; one piece of white paper towel containing red stains from the right rear floor; and one used condom from the right rear floor. N.T. 04/21/16 at pp. 87-92.

The autopsy on Ruby Ellis was conducted in 1989 by Dr. Paul Hoyer. N.T. 04/20/16 at pp. 63-64. Since Dr. Hoyer was no longer employed by the Medical Examiner's Office at the time of trial, Deputy Medical Examiner, Dr. Albert Chu, testified to the details of the autopsy report. *Id.* at pp. 71-72.

Ms. Ellis was nineteen (19) years old, 5 feet, 3 inches, 96 pounds. *Id.* at pp. 93-94. The following articles of clothing were received with the body: a red leather jacket, a long-sleeved black blouse, a long-sleeved gray sweatshirt, a pair of pants, underwear, socks, a stocking on the left foot, and a pair of blue jeans with red staining. *Id.* at pp. 64-67. A segment of twine was wrapped around Ms. Ellis's neck four times. *Id.* at pp. 64, 73. A portion of the neck of the blouse was "incorporated into the ligatures about the neck." *Id.* at p. 66.

Dr. Chu testified that Ms. Ellis had an abrasion on her forehead; her right eye was swollen; and portions of her lips were swollen and bruised. *Id* at pp. 69, 73. The mark on her forehead was consistent with Officer Gibson's testimony that Ms. Ellis's head was resting against the right rear door of the vehicle when she arrived at the scene. *Id* at pp. 82-83.

Ms. Ellis had petechial hemorrhages on both sides of her face, around both eyes, and on the left eye. *Id.* at pp. 74-75. Dr. Chu testified that petechiae often occurs in cases of strangulation or where there has been forceful compression of the neck Blood enters the brain and is unable to drain, causing pressure to build. *Id.* at pp. 74-76. Ms. Ellis had abrasions on the midline and right side of her neck and bleeding on the inside of the right side of her neck. *Id* She had two bruises on the left side of her neck. *Id.* at p. 85. The cause of death was ligature strangulation. The manner of death was homicide *Id.* at p. 80.

The toxicology report from 1989 indicated that Ms. Ellis had cocaine and Benzoylecgonine, a metabolite of cocaine, in her system *Id.* at pp. 85-87. Dr. Chu testified that the fact that she had cocaine in her system meant that she ingested it relatively recently before her death. *Id* Rectal swabs showed the presence of sperm and gave a slightly positive reaction for acid phosphatase. *Id.* at p. 82.

Ryan Gallagher, manager of the Criminalistics Unit of the Philadelphia Police Department Office of Forensic Science, testified as an expert in the identification of biological materials on evidence. N.T. 04/22/16 at pp. 54-63. He testified to the contents of a report prepared in 1989 by an analyst in the criminalistics unit at that time. *Id* at pp. 80-81. The 1989 report stated the following with regard to items collected from the crime scene.

- Soiled green cloth: Analysis did not detect the presence of blood. Tests for seminal stains were negative. *Id* at p. 84.

6

- Brown "Giant" label work boots. Analysis did not detect the presence of blood. *Id.*

- Very large section of brown cloth: Numerous areas of the cloth were tested for blood and semen. *Id* at p. 84. Analysis did not detect the presence of blood. Analysis detected the presence of semen in six (6) areas of the cloth  Analysis detected the presence of blood group substances[2] on six (6) areas of the cloth. *Id* at pp. 84-85.[3]

- White, pink, and green nightgown: Stained with human type O blood. Analysis detected semen in two (2) areas of the nightgown. Analysis detected presence of blood group substance on two (2) areas of the nightgown. *Id* at p. 94.

- White paper towel: Stained with human type B blood. Analysis did not detect the presence of semen. *Id* at p. 95.

- One used condom: Test for seminal stains on the outside of the condom were negative. Analysis detected semen on the inside of the condom. Analysis detected the presence of blood group substance on the inside of the condom. *Id.[4]*

The 1989 report stated the following with regard to items collected from the body of Ruby Ellis:

---

[2] Mr Gallagher testified that in 1989, before there was DNA testing, the criminalistics unit would analyze the evidence for biological materials, i e  blood, semen, and saliva. The second step would be to analyze the evidence to determine the blood type. Even if blood is not present, blood groups may still be present in that biological material. *Id* at pp. 85-89. The blood grouping analysis that was done in 1989 has been replaced by DNA analysis today *Id* at p 94

[3] Twenty-four (24) samples were taken from the brown cloth. Mr. Gallagher testified that the swab from the brown cloth was not submitted for DNA analysis because, as part of the cold case grant, only the most probative items capable of developing a DNA profile were submitted for further testing. N.T. 04/25/16 at pp. 64-65. In prioritizing the evidence, he testified that he was aware that the vehicle in which Ms. Ellis's body was recovered was parked in an abandoned lot and that multiple people had access to it *Id* at pp. 85-86

[4] Mr Gallagher testified that in 1989, the laboratory would have taken a sample from the inside and outside of the condom and put it onto a microscopic slide. The slide is then stained and looked at under a microscope to determine if there are sperm cells present in the sample. *Id* at pp 95-96  There is a general grading system for the amount of sperm present on a slide. The grading ranges from one (1) plus to four (4) plus, four plus being the strongest concentration of sperm and the most likely to generate a DNA profile *Id* at pp 98-100  DNA is only contained in the head of the sperm. *Id* at p 98.

- Envelope labeled left hand morgue· Fingernail scrapings, miscellaneous debris, assorted hair fragments, and a red fiber. *Id* at p. 108.[5]

- Envelope labeled right hand morgue: Wood stick with fingernail scrapings. *Id.* at pp. 108-09.

- White envelope labeled head hair: Numerous light, to medium, to dark brown hairs, hair fragments, and a red fiber. *Id* at p. 109.

- White envelope labeled pubic hair: Numerous curly, light, to medium, to dark brown hairs and hair fragments. *Id* at pp. 109-10.

- White naturally occurring fiber: No further analysis conducted on that fiber. *Id* at pp. 110-11.

- Blood recovered from body of Ruby Ellis. Type B positive. *Id.* at p. 111.

In 2009, Mr. Gallagher received the physical evidence in Ruby Ellis's case from the evidence custodian unit. He began re-testing of the evidence in 2011 and generated a report of his findings in 2015. N.T. 04/25/16 at pp. 61-64. The report stated the following with regard to items collected by the Medical Examiner in 1989:

- Vaginal, rectal, and oral slides: Seminal stains containing spermatozoa were observed on the vaginal and rectal slides. N.T. 04/22/16 at pp. 115-16. The designation given to the sperm on both slides was a two (2) plus. N.T. 04/25/16 at pp. 69-71. Mr. Gallagher testified that the slides were deemed not suitable for DNA analysis because they did not contain a cover over top of them to protect the DNA sample N T. 04/22/16 at pp. 117-19.

---

[5] Mr Gallagher testified that in cases where fingernail scrapings are taken, the laboratory will either receive the fingernails the Medical Examiner cut off of the person and swab the nails themselves, or, the ME will take a wooden stick or Q-tip themselves and take a swab or sample from underneath the fingernails. *Id* at pp 108-09

8

- Envelope labeled left hand morgue: Swabbed both ends of the wooden stick. *Id.* at p. 120. Saved for possible DNA analysis. *Id* at p. 124.

- Envelope labeled right hand morgue: Swabbed both ends of the wooden stick. *Id.* at p. 121 Saved for possible DNA analysis. *Id* at p. 124.

- Envelope labeled head hair: Cutting of three roots from the clump of hair. *Id* at pp. 121-22. Saved for possible DNA analysis. *Id.* at p. 124.

- Envelope labeled pubic hair: Cutting of six roots from the clump of hair. *Id* at pp 122-23. Saved for possible DNA analysis. *Id* at p. 124.

- Envelope labeled fiber – perineum: One white colored fiber and some debris.

- One used condom: Two microscopic slides made. *Id.* at pp. 106-07.

Mr. Gallagher's 2015 report stated the following with regard to items collected by the crime scene unit in 1989:

- Brown "Giant" label work boots: Size 6. Received with laces. Visual examination detected brown stains on booth boots and a crusted white stain on the front of the left boot. Swabs of the brown stain, white crusted stain, and inside ankle area were taken. *Id.* at pp. 125-26. The swab of the white crusted stain was tested for acid phosphatase.[6] The results of the test were inconclusive. *Id* at p. 132. Seminal stains containing spermatozoa were observed on that sample *Id.* Swabs were saved for possible DNA analysis. *Id.* at pp. 133-34.

- White paper towel with light brown, dark brown and gray stains: Cutting taken of light brown stain. Cutting taken of dark brown stain. *Id.* at p. 127. Chemical presumptive test detected presence of blood in both samples. *Id.* at p. 128. Samples

---

[6] Mr Gallagher testified that an acid phosphatase test and microscopic examination are done to check for the presence of seminal fluid and sperm *Id* at pp. 131-32.

were of an insufficient quantity for presumptive human protein tests *Id* at p. 129. Cuttings saved for possible DNA analysis. *Id*

- Microscopic slides from inside and outside of condom: Swabbed both slides and consolidated the sample. *Id* at pp 106-07, 127-28. Swabs saved for possible DNA analysis. *Id* at p. 133. On cross-examination, defense counsel introduced a letter indicating that the condom was sent to Cellmark Diagnostics in March 1991, an outside forensic laboratory that has since closed. N T. 04/25/16 at pp. 50-52. A property receipt indicated that the condom may have been destroyed. *Id* at pp. 54-56. The condom was not with the evidence received by Mr. Gallagher. *Id.* at p. 56.

Bryne Strother, DNA technical leader of the Criminalistics Unit of the Philadelphia Police Department Office of Forensic Science, testified that her laboratory tests for sixteen (16) different loci when it conducts a DNA analysis. N.T. 04/25/16 at pp. 126-27.[7] DNA analysis was conducted on the following items in Ruby Ellis's case. sperm fraction of the white crusted stain on the front of the left tan work boot; e cell fraction[8] of the same white crusted stain; sperm fraction from the inside of the condom; e cell fraction from the inside of the condom; wooden stick from the envelope labeled left hand (fingernail scrapings); wooden stick from the envelope labeled right hand (fingernail scrapings); swab of the inside ankle area and lace ends of both tan work boots; swab of the red stain from both tan work boots; and the cuttings of the white paper towel with light and dark brown stains. N.T. 04/27/16 at pp. 80-87.

---

[7] Ms Strother testified that the Federal Bureau of Investigations recommends testing for thirteen (13) core loci N T 04/25/16 at p 127.

[8] An e cell is any other cell type other than a sperm cell N T 04/27/16 at pp. 178-79. For example, touch DNA or "e cells" may be observed when an individual comes in contact with an item and skin cells are left on the item *Id* at pp 127-28 Ms. Strother testified that there is no way to determine what type of cell that the DNA came from, i e skin cell or blood cell. *Id* at p 179

After the reference sample from the Defendant was received and processed, a report comparing him to the DNA evidence was prepared. *Id.* at pp. 83-88. The swab of the inside ankle area and lace ends of both tan work boots showed a mixture of partial DNA profiles consistent with originating from at least two individuals, at least one of whom is female. Due to insufficient information, the origin of the DNA with regard to Ruby Ellis was inconclusive. The Defendant was excluded as a contributor to the mixture detected in the sample. *Id.* at pp. 89-90.

The swab of the red stain from both tan work boots was a mixture of partial DNA profiles consistent with originating from at least two individuals, at least one of whom is male. Ruby Ellis was excluded as a contributor to the mixture detected in the sample. Due to insufficient information, the origin of the lighter intensity alleles with regard to the Defendant was inconclusive. *Id.* at pp. 91-92, 96-99.[9] The Defendant was excluded as a contributor to the mixture detected in the sample of the inside ankle area and lace ends of both tan work boots. *Id.* at p 96

Ms. Strother testified to a reasonable degree of scientific certainty that the Defendant was the source of the DNA found on the white paper towel with dark brown stain taken from inside the Oldsmobile N.T. 04/27/16 at pp. 92-93. The probability of randomly selecting an unrelated individual, who would be included as a contributor of the major component of the DNA mixture detected in the sample, was 267.5 quadrillion in the African-American population; 1 in 6.549 quintillion in the Caucasian population; and 1 in 284.2 quadrillion in the Hispanic population. N.T 04/28/16 at pp. 38-39.[10]

---

[9] Ms Strother testified that the lighter intensity alleles detected within this sample were 16, 30, 13, and Y The Defendant also had a 16, 30, 13, and Y. N T 04/27/16 at p 91

[10] Defense counsel elicited on cross-examination that the following items were not analyzed for DNA: vaginal and rectal swabs taken by the Medical Examiner from Ruby Ellis, a fork in the glove compartment of the vehicle visible in a photograph taken by the Crime Scene Unit; a cup on the floor of the vehicle visible in a photograph taken by the Crime Scene Unit; the brown cloth recovered in the vehicle, any of Ms Ellis's clothing; and the ligature used to strangle Ms Ellis. N.T. 04/28/16 at pp 13-16

Defense expert Katherine Cross, DNA technical leader at Guardian Forensic Sciences, testified that she agreed that the blood on the napkin was a single source contributor, i.e. a definitive match to the Defendant. N.T. 04/28/16 at pp 112-13.

Cheryle Dowling testified that she was friends with Ruby Ellis. The last time she saw Ms. Ellis was at a crack house on 27th and Thompson Streets. N.T. 04/21/16 at pp. 13-17. She asked Ms. Ellis to stay with her Ms. Ellis replied that she had to go see somebody on 25th Street and that she would be back later. *Id* at p. 17; N.T. 04/27/16 at pp 40-41. Ms. Dowling found out about the murder the next day. N T. 04/21/16 at p. 18. She testified that the Defendant looked similar to a man named "Rudy" who was a few years older than her and lived on the 2400 block of Thompson Street. *Id* at pp. 23-24, 31-34; N.T. 04/27/16 at pp. 41-42.

Lombay Swain testified that she was friends with Ruby Ellis and Cheryle Dowling. They grew up together in North Philadelphia. N.T. 04/20/16 at pp. 151-54. Ms. Ellis and she would hang out, get high, and prostitute themselves to pay for the drugs. *Id* at p. 154. On March 17, 1989, Ms. Swain and the decedent got high in an abandoned house on 25th and Stewart Streets. Ms. Ellis was with a man whom Ms. Swain had never seen before. He was approximately six (6) feet in height and had a complexion similar to the Defendant's.[11] He said he was from Atlanta. *Id* at pp. 157-58. Ms. Swain testified that she saw a "darkness and coldness" in the man's eyes and begged Ms. Ellis not to go anywhere with him. Ms. Ellis responded that she was going with him because he had money and she wanted it. *Id.* at pp. 158-59 Ms. Swain never saw Ms. Ellis again that night and found out the next morning that Ms. Ellis had been murdered. *Id.* at pp. 161-63, 167

---

[11] Neither Ms Dowling nor Ms Swain could identify the Defendant as the man Ms Ellis was with prior to her murder

12

On April 23, 1989, at approximately 9:00 p.m., Philadelphia Police Detective Jeffrey Piree responded to a report of a deceased female at 1246 West Girard Avenue, a vacant, burned-out bar. N.T. 04/26/16 at pp. 5-10. Thirty-three-year-old Cheryl Hanible's partially-clothed body was found in a closet without a door under a stairwell on the second floor of the bar. A blanket was covering the body. *Id.* The decedent had skin slippage to her face and her hands appeared mummified. *Id* at p. 6. A sweat sock was stuffed in her mouth. *Id* at p. 8. One of her shoelaces had been removed from her shoe, wrapped around her neck multiple times, and tied in a knot across the center of her throat. *Id* at p. 9.

Detective Piree testified that there appeared to be similarities between Ruby Ellis' and Cheryl Hanible's murders both occurred in close proximity to each other; the cause of death in each case was ligature strangulation; the bodies were found in confined areas; and both women were working as prostitutes in the same area. *Id* at pp. 14-17.

The autopsy on Cheryl Hanible was conducted in 1989 by Dr. Bennett Preston. *Id* at p. 96. Since Dr Preston was no longer employed by the Medical Examiner's Office at the time of trial, Dr. Albert Chu, Deputy Medical Examiner, testified to the details of the autopsy report. *Id*

Ms. Hanible was 33 years old, 5 feet, 4 inches, 127 pounds. *Id* at p. 92. Her body showed signs of decomposition, i.e. slippage of the skin and fly larvae activity. *Id* at pp 98-99, 131-32. It was reported that the last time Ms. Hanible had been seen prior to the discovery of her body on April 23, 1989 was on April 16, 1989. Dr. Chu testified that the decomposition was consistent with the passing of that approximate amount of time. *Id* at pp. 99-100.

The decedent was found with her pants and panties pulled down around her thighs. N.T. 04/20/16 at pp 92-93. The following articles of clothing were received with the body· two white socks, one of which was "jammed" in her mouth (right sock), two white gym shoes with the shoelace of one being wrapped around the neck three times and tied in a knot in the front of her throat, a blue jacket, a long-sleeved maroon sweater, a tank top, a thermal undershirt, a pair of blue jeans, a pair of underpants, a knit cap, and a bra. *Id* at pp. 93-94, 104-05.

Ms. Hanible had a skin furrow of the skin that corresponded to where the shoelace was tied. She had hemorrhage in the muscles of the neck where the ligature was, indicating she was still alive when the ligature was applied. *Id* at pp. 105-06. She also had two abrasions above the furrow on the left side of her neck. *Id* at pp. 112-13. The cause of death was ligature strangulation. The manner of death was homicide. *Id* at p. 102.

The toxicology report indicated that Ms. Hanible had cocaine in her blood and alcohol in her blood and urine. *Id* at pp. 107-08. Dr. Chu testified that the fact that she had cocaine in her system meant that she ingested it relatively recently before her death. *Id.* Rectal swabs showed both acid phosphatase and sperm and the vaginal swabs showed sperm. *Id.* at pp. 109-10.

Louis Szojka, laboratory program scientist at the Philadelphia Police Department Criminalistics Laboratory, was employed as a forensic scientist in that unit in 1989 and examined evidence in Cheryl Hanible's case at that time.[12] N.T. 04/21/16 at pp. 134, 143, 149-50. His report from 1989 indicated that the following items were received from the Office of the Medical Examiner: envelope labeled ligature which contained a looped and knotted blue cloth shoelace; nail scrapings; pubic hair; head hair; and left artificial eye. *Id.* at pp. 150-51.

---

[12] Mr Szojka was not part of the team that was working on the cold case grant. N.T 04/22/16 at pp. 20-21.

The 1989 report indicated that the following articles of clothing were received in maggot-infested condition: dirty blue hooded jacket with a White Stag Label, dirty purple, white and blue pullover shirt with a Gabrielle label; dirty white and pink woman's athletic t-shirt with an Alma Nouveau Classic label; dirty white bra, dirty pair of blue denim jeans; fecal-stained pair of turquoise blue panties with a "micro brief" label; pair of white, blue and yellow sneakers with an Aerobix label - the right sneaker had a blue cloth shoelace; the left sneaker was received with no shoelace; dirty pair of white sweat socks, one of which was stained with decomposition fluids; knit hat; and dirty fecal-stained pair of white and gray jockey-style underwear with a BVD label. *Id.* at pp. 152-65.

Ryan Gallagher, manager of the criminalistics unit of the Philadelphia Police Department Office of Forensic Science, testified he re-examined the evidence in Cheryl Hanible's case in 2011 and generated a report of his findings in 2016. N.T. 04/25/16 at pp 73-75. This evidence included items collected by the Medical Examiner in 1989. The report indicated that ten roots were removed from a large clump of medium brown hair as a presumptive reference for the decedent's DNA. *Id* at p. 13. Fingernail clippings from the decedent's left and right hand were too small to swab. They were saved for possible DNA analysis. *Id.* at p. 12.

Swabs were taken from the knotted area of the ligature and the ends of the ligature. *Id* at pp. 10-11. Mr. Gallagher testified that he swabbed the areas of the ligature where the decedent's DNA would least likely to be found  Since Ms. Hanible's body was found multiple days after her death, he opined that her DNA and epithelial cells had the potential to overwhelm any other DNA that was present on the ligature. *Id.* at pp. 6-10.

Mr. Gallagher conducted a visual examination with an alternate light source[13] on the articles of clothing collected from the body of Cheryl Hanible by the Medical Examiner in 1989 He then conducted an acid phosphatase test as a second screening tool to determine if the laboratory should move forward with the evidence any further. He testified that if the acid phosphatase test was negative, he would still proceed with a microscopic examination for spermatozoa because acid phosphatase is a protein that breaks down easily over time. *Id* at pp. 20-22

Mr. Gallagher's report indicated that he did not observe any biological stains or anything of evidentiary value on the blue denim jacket; purple collared sweater; dirty white bra; white socks; or the multicolored stripe wool hat. *Id* at pp. 14-15, 17, 20.

The test with the alternate light source fluoresced in certain areas of the ribbed athletic T-shirt Cuttings were taken from the center of the lower back and from the back lower right side *Id* at pp. 15-16, 22. The acid phosphatase test was negative on both cuttings. *Id.* at pp. 22-23. No spermatozoa was observed during the microscopic examination. *Id* at pp. 23-24.

The test with the alternate light source fluoresced in certain areas of the blue denim jeans. Cuttings were taken from the front upper right outside, the front upper left leg, the back near the mid-waistband, and the inside back near the mid-waistband. *Id.* at pp. 17-18, 22. The acid phosphatase test was negative on the three cuttings. *Id.* at pp. 22-23. Microscopic examination showed the presence of spermatozoa on the cutting from the inside of the back of the jeans near the mid-waistband. *Id* at p. 24. The cutting was sent to the DNA laboratory for analysis. *Id* at pp. 26-27. Spermatozoa was not observed on the other two cuttings. *Id.* at pp. 23-24.

[13] Mr Gallagher testified that he laid the evidence out on a table and used an alternate light source, similar to a black light, to search for biological stains. This test was not available in 1989 *Id* at pp. 16-17

The test with the alternate light source fluoresced in certain areas of the teal underwear. Cuttings were taken from the middle crotch and from the right side. *Id* at pp. 18-19, 22. The acid phosphatase test was negative on both cuttings *Id.* at pp 22-23. Microscopic examination showed the presence of spermatozoa on the cutting from the middle crotch. *Id* at p. 25. The cutting was sent to the DNA laboratory for analysis. *Id* at pp. 26-27 Spermatozoa was not observed on the cutting from the right side. *Id* at pp. 23-25.

A pair of white leather "Aerobix" sneakers in size 8 were received with Ms. Hanible's body The right sneaker was received with light blue laces and untied The left sneaker was received without laces. A swab was taken from the back rear heel area of the left sneaker and sent to the DNA laboratory for analysis. *Id.* at pp. 19-20, 26-27.

Mr. Gallagher also re-analyzed the size small BVD underwear collected from the second-floor, front room of the building by the Crime Scene Unit in 1989.[14] The test with the alternate light source fluoresced in certain areas of the underwear. *Id* at pp. 31-32 Cuttings were taken from the front left leg hole and the inside waistband. *Id* at pp. 30-31. The acid phosphatase test was negative for those cuttings. Microscopic examination showed the presence of spermatozoa on the cutting from the front left leg hole. *Id* at p. 32.

Bryne Strother, DNA technical leader of the Criminalistics Unit of the Philadelphia Police Department Office of Forensic Science, testified that a specific type of DNA testing called Y-STR DNA, which focuses on DNA only from males, was utilized in Cheryl Hanible's case. N.T. 04/25/16 at p 148. Y testing requires a minimum of twelve (12) loci in order to have an inclusion. *Id* at pp. 158-59. All males within the same paternal lineage will have the same Y chromosome DNA profile. *Id.* at p. 176. The Y-STR DNA test was performed on certain samples

---

[14] The BVD underwear were recovered in a different room from where the body was recovered

from evidence in Cheryl Hanible's case and a partial Y chromosome DNA profile was developed. *Id* at p. 149.

DNA analysis was performed on the following items: sperm fraction of the cutting of jeans from the inside back near the mid-waistband; e cell fraction of the cutting of the jeans from the inside back near the mid-waistband; swab of the ligature; sperm fraction of the cutting of the BVD logo recovered from the front bedroom of the building where Ms. Hanible's body was recovered; e cell fraction of the BVD logo underwear; and swab of the rear heel of the left sneaker without laces.

DNA testing of the sperm fraction of the cutting of the jeans from the inside back near the mid-waistband generated a partial DNA profile N.T. 04/27/16 at pp. 108-09.[15] The partial DNA profile detected in the sample was consistent with originating from at least one individual, at least one of whom is male. Due to insufficient information, the origin of the DNA detected in the sample with regard to the Defendant was inconclusive. Cheryl Hanible was excluded as a source of the DNA detected in the sample. *Id* at pp. 107-11.

The e cell fraction of the cutting of the jeans from the inside back near the mid-waistband generated a partial DNA profile. The partial DNA profile was consistent with originating from Cheryl Hanible and at least one individual. Due to insufficient information, the origin of the DNA detected in the sample with regard to the Defendant was inconclusive. *Id* at pp. 112-13.[16]

---

[15] Ms Strother testified that the loci detected in the partial DNA profile were 16, 9, 12, 10, 11, 10 (Penta D), X, Y, 19, and 11. The Defendant also had a 16, 9, 12, 10, 11, 10 (Penta D), X, Y, 19, and 11 N.T. 04/27/16 at pp 107-10
[16] Ms Strother testified that she would have been more conservative with this conclusion had she generated the report She would have concluded that the partial DNA profile of the e cell fraction of the jeans was consistent with originating from at least one individual, and that due to insufficient information, the origin of the DNA detected in the sample with regard to Ms. Hanible was inconclusive. N.T. 04/27/16 at pp 114-16. This conservative hypothetical would not take into account the fact that the jeans were taken off of Ms. Hanible's body by the Medical Examiner *Id* at pp 116-18

18

The sperm fraction of the cutting of the BVD logo underwear generated a partial DNA profile. The Defendant and Cheryl Hanible were both excluded as a source of the sample. *Id* at pp. 113-14. The e cell fraction of the cutting of the BVD logo underwear generated a partial DNA profile. The Defendant and Cheryl Hanible were both excluded as a source of the sample. *Id* at pp. 119-22. The swab of the waistband of the BVD logo underwear generated a partial profile. Due to insufficient information, no conclusion could be made regarding the origin of the DNA detected in the sample with regard to the Defendant and Cheryl Hanible. *Id* at pp. 125-26.

The swab of the ligature taken from Cheryl Hanible generated a partial DNA profile The partial DNA profile detected in the sample was consistent with originating from at least one individual, at least one of whom is male. Due to insufficient information, the origin of the DNA detected in the sample with regard to the Defendant and Cheryl Hanible was inconclusive.[17]

Ms. Strother testified that the swab of the rear heel of the left sneaker without laces showed a mixture of partial DNA profiles originating from at least three individuals, at least one of whom is male. The higher intensity alleles present in the sample taken from the sneaker were consistent with the Defendant's DNA profile. N.T. 04/27/16 at pp. 142-45.

The DNA mixture profile was 629,800 times more likely to occur under the scenario that it is a mixture of DNA originating from Cheryl Hanible, the Defendant, and one random, unrelated person as opposed to the scenario that it originated from a mixture of DNA from Cheryl Hanible and two random, unrelated people in the African-American population; 1.427 million times more likely to occur under the scenario that it is a mixture of DNA originating from Cheryl Hanible, the Defendant, and one random, unrelated person as opposed to the scenario that it originated from a mixture of DNA from Cheryl Hanible and two random,

---

[17] Ms Strother testified that the loci detected in the partial DNA profile were 16, 16, 7, 9, 12, 13, X, Y, 16, 18 The Defendant also had a 16, 16, 7, 9, 12, 13, X, Y, and 18 N T 04/27/16 at pp 122-25

19

unrelated people in the Caucasian population; and 405,400 times more likely to occur under the scenario that it is a mixture of DNA originating from Cheryl Hanible, the Defendant, and one random, unrelated person as opposed to the scenario that it originated from a mixture of DNA from Cheryl Hanible and two random, unrelated people in the Hispanic population. *Id* at pp. 127-39.[18]

Defense expert Katherine Cross, DNA technical leader at Guardian Forensic Sciences, criticized the conclusions reached by the Commonwealth's expert. She testified that she would have determined that the partial DNA profile detected in the sperm and skin fractions from the inside back near mid-waistband of the jeans was exclusive with regard to the Defendant as opposed to inconclusive. N.T. 04/28/16 at pp. 75, 121-22. Additionally, she testified that the data for the shoe supported a minimum of at least two contributors and that both Ms. Hanible and the Defendant are excluded from that partial mixture profile. *Id* at pp. 128-49, 174-75; N.T. 04/29/16 at pp 17-19, 24-33.

Judy Hall-Minhas was Cheryl Hanible's girlfriend. They met while Ms. Hanible was staying at Genesis, a halfway house in North Philadelphia, and started dating in October of 1988. N.T. 04/20/16 at pp. 172-75 At the time of her death, Ms. Hanible was living at the Food for Life Center on Broad Street and Girard Avenue and was going to counseling in that area. *Id* at pp. 200-02. She had met a group of girls from 15th and Girard Avenue and was hanging out with them. *Id* at p. 201.

The last time Ms Minhas spoke to Ms. Hanible was on April 15, 1989. *Id* at p. 178. Ms. Hanible sounded like she had been drinking and asked her for money. *Id* at pp. 178-79, 192. In a

---

[18] On cross-examination, defense counsel showed photographs taken by the Crime Scene Unit of the sneaker without laces The sneaker appears to be on top of some debris near the body Ms. Strother testified that the e cells on the heel of the left sneaker could have been the result of secondary transfer, i.e. Ms Hanible having stepped on someone else's spit N.T 04/27/16 at pp. 181-83

statement to detectives on April 30, 1989, Ms. Minhas stated that she was mad at Ms. Hanible because she had been giving her money for several weeks and every time Ms. Hanible called, she was out with someone and would ask for money. *Id* at pp. 198-99. She learned Ms. Hanible had been working as a prostitute *Id* at pp. 179-80.

## ANALYSIS

### Issue I

Defendant argues that the evidence was insufficient to sustain the jury's verdict of guilt for first degree murder and PIC because no physical evidence conclusively established that the Defendant was the perpetrator and the only evidence identifying him was the testimony of jailhouse informant, Richard Simmons.

The standard of review for a challenge to sufficiency is well-settled.

The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the

21

above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Com v Slocum*, 86 A.3d 272, 275-76 (Pa. Super 2014) (citing *Com v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), app. denied, 987 A.2d 158 (Pa. 2009) (quoting *Com v. Smith*, 956 A.2d 1029, 1035-36 (Pa. Super. 2008) *(en banc)*).

To sustain a conviction of first-degree murder, the evidence must prove beyond a reasonable doubt the three elements of first-degree murder: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Com v Houser,* 18 A.3d 1128, 1133 (Pa. 2011). First-degree murder is an intentional killing, *i e ,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). The Pennsylvania Supreme Court has found evidence of death by strangulation sufficient to establish the requisite intent for first degree murder. *See Com v Martin,* 101 A.3d 706, 719 (Pa. 2014), cert. denied, 136 S. Ct. 201, 193 L. Ed. 2d 155 (2015)

22

(appellant acted with malice and a specific intent to kill by strangling victim until she was dead), *Com v Cooper*, 941 A.2d 655, 662 (Pa. 2007) (same).

"A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). Accordingly, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) possessed any instrument of crime and (2) with intent to employ it criminally *Com v Robertson*, 874 A.2d 1200, 1208 (Pa. Super. 2005).

Defendant does not contest that Ruby Ellis and Cheryl Hanible were killed or that the requisite intent for first degree murder and PIC was established; he solely challenges the jury's finding that he was responsible for the killings. In both cases, the evidence wove a web tight enough to support the jury's finding that the Defendant, rather than some unknown person, was the victims' assailant.

The Defendant was arrested for the March 1989 murder of Ruby Ellis after the Combined DNA Index System (CODIS) produced a match between his DNA, collected in Georgia, and evidence collected at the crime scene, an abandoned 1975 Oldsmobile parked with other abandoned vehicles on the 1500 block of West Flora Street. The jury heard testimony that the last person Ms. Ellis was seen with was a man similar in height and complexion to the Defendant The man said he was from Atlanta. The Defendant had ties to Atlanta, Georgia and was living in Philadelphia in close proximity to the crime scene at the relevant time period.

Ms. Ellis told her friend, Lombay Swain, that she was going with the man because he had money and she wanted it. Jailhouse informant, Richard Simmons, testified that the Defendant told him about two murders he committed when he was working as a "hustler" in Philadelphia and stated that he would not have gotten caught had he not been required to give a DNA sample

when he was in Georgia. The Defendant told Mr. Simmons that one of the murders was committed outside. The veracity of this testimony was for the jury to decide. *See Slocum*, 86 A 3d at 275-76 (factfinder was free to believe all, some, or none of the evidence).

DNA testing conclusively established that the Defendant was the source of the DNA on the paper towel with the dark brown stain collected from the floor of the backseat of the vehicle where Ms. Ellis's body was found  Ms  Ellis had physical injuries indicative of a struggle, which would corroborate the Defendant's blood being present on a paper towel in the vehicle. Defense counsel tried to explain the presence of his DNA on the paper towel by bringing out on cross-examination that the abandoned vehicle was frequented by drug-users and prostitutes. Defendant presented a theory that his DNA was coincidentally at the crime scene underneath Ms  Ellis's body. The jury was free to disbelieve him  *See Slocum, supra.*

The Defendant was arrested for the April 1989 murder of Cheryl Hanible after CODIS produced a match between his DNA and evidence collected at the crime scene, an abandoned burned-out bar approximately four blocks away from the Ellis crime scene. In addition to their closeness in time and proximity, evidence showed other similarities between the two homicides.

Ms. Hanible and Ms. Ellis were dark-skinned, African American females with short hair and similar stature. Both women had a history of drug use and prostitution. Toxicology reports indicated that both women had ingested cocaine shortly before their death. The Medical Examiner in each case noted two bruises or abrasions on the left side of their neck. Rectal swabs of both women showed the presence of sperm.

Ms. Hanible and Ms. Ellis's respective bodies were found in concealed areas with a blanket partially covering them and their heads exposed. Ms. Ellis was strangled with a piece of twine, which was wrapped around her neck four times and tied in a knot near center of her throat

24

Ms. Hanible was strangled with one of her shoelaces, which was wrapped around her neck three times and tied in a knot near the center of her throat. Based on this evidence, a jury could readily conclude that Ms. Ellis and Ms. Hanible were strangled by the same person

DNA testing established that the Defendant was the major contributor of the DNA collected from the rear heel of Cheryl Hanible's left sneaker, which was missing the shoelace that was used to strangle her. The defense expert criticized the findings of the Commonwealth's DNA expert. As in the Ellis case, defense counsel argued that the abandoned, burned out bar where Ms. Hanible's body was found was frequented by drug users and prostitutes. Assuming the jury believed the Commonwealth's expert, it was reasonable for it to conclude that the Defendant held Ms. Hanible's sneaker by its heel, removed the shoelace, and wrapped it around her neck. Again, Defendant presented a theory that his DNA was coincidentally at the crime scene. The jury was free to disbelieve him. *See Slocum, supra.*

The Commonwealth's evidence, and all reasonable inferences deducible therefrom, was sufficient to establish beyond a reasonable doubt that the Defendant was the person who committed both murders. Given the above discussion of the first degree murder convictions, there is sufficient evidence from which the jury could infer that it was this Defendant who strangled Ms. Ellis and Ms. Hanible, thereby possessing both ligatures as instruments of crime with the intent to use them criminally. 18 Pa.C.S. § 907.

**Issue II**

Defendant argues that the verdict was against the weight of the evidence because: (1) the only testimony implicating the Defendant in the killings came from Richard Simmons, a jailhouse informant with numerous convictions and a documented history of mental illness; (2) the DNA evidence was too tenuous to prove murder as it was single source blood on a napkin in

25

an abandoned car full of trash in one case, and mixture skin cells on a shoe in the other case; and (3) the Commonwealth lost and/or did not test other evidence, including, but not limited to, one ligature, both rape kit slides, and the cloths covering the bodies.

"[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Com v Thompson*, 106 A 3d 742, 758 (Pa. Super. 2014) Accordingly, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Com. v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). A trial judge should not grant a new trial due to "a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* Instead, the trial court must examine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* Only where the jury verdict "is so contrary to the evidence as to shock one's sense of justice" should a trial court afford a defendant a new trial *Id*

The weight of Richard Simmons' testimony was for the jury to decide. The defense extensively cross-examined and attempted to impeach him with evidence of prior convictions and his history of mental illness. The jury's decision to credit his testimony does not render the verdict contrary to the evidence presented. The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and determine the credibility of witnesses. *Com. v. Hankerson*, 118 A.3d 415, 420 (Pa. Super. 2015) (citation omitted).

The issues raised by the defense regarding the interpretation of the DNA evidence go to the weight of the challenged evidence. *Com v Chmiel*, 30 A.3d 1111, 1157 (Pa. 2011) (weight

and persuasiveness of DNA evidence were properly matters for the jury to determine) (citation omitted). The Commonwealth's DNA expert, Bryne Strother, testified that the term "match" is used when there is a DNA profile originating from one person and the rarity of that DNA profile is above 7.1 trillion. The DNA detected in the sample from the white paper towel with dark brown stain taken from inside the vehicle where Ruby Ellis's body was found "matched" the DNA profile obtained from the Defendant to a reasonable degree of scientific certainty [19] That there were other items of trash in the vehicle is not a fact so clearly of greater weight that to ignore it or to give it equal weight with all the facts is to deny justice. *Clay, supra.*

Ms. Strother testified that the DNA on the heel of Cheryl Hanible's left sneaker with the missing shoelace that was used to strangle her originated from at least three sources. The major contributor, however, was the Defendant. Based on this testimony, it was reasonable for the jury to conclude that the Defendant was the person who removed the shoelace from Ms. Hanible's sneaker since he was the dominant contributor of the DNA. The defense expert criticized these findings "A jury decision to credit certain evidence and reject other testimony is appropriate." *Com v Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012). The court's sense of justice was not shocked by the verdict simply because the swab produced a mixture of different cell types.

Defendant lastly argues that this court should find the jury's verdict was against the weight of the evidence because the Commonwealth did not test and/or lost certain evidentiary items. Specifically, the ligature around Ruby Ellis's neck, both rape kit slides, and the cloths covering both bodies.

Stated previously, the Philadelphia Police Department Office of Forensic Science received a grant to research, evaluate, and analyze cold cases to determine if advancements in

---

[19] Ms Strother stated that to find another individual with the identical DNA profile, she would have to look at a population that is one thousand times the size of the world population N.T 04/27/16 at p 94

27

DNA testing would enable retesting of evidence containing DNA to develop DNA profiles in order to aid in the identification of perpetrators of cold cases. N.T. 04/22/16 at pp. 63, 75-77. Evidence in the March 1989 murder of Ruby Ellis and the April 1989 murder of Cheryl Hanible was reanalyzed as part of this grant. *Id.*

Ryan Gallagher, manager of the Criminalistics Unit, testified that a determination as to which pieces of evidence were tested was made by that department and homicide detectives based on cost, the condition of the evidence, and it's potential to produce a DNA profile for analysis. *See* N.T. 04/25/16 at pp. 93-99. The grant money received was distributed amongst various cold cases. *Id* at p. 98. The laboratory would determine which pieces of evidence had the potential to produce the most probative result with the least amount of testing. *Id* at pp 98-99. It would then conduct a first round of testing with the evidence most likely to produce a DNA profile for DNA analysis. If no biological material was found and no DNA profile was developed, the laboratory would reanalyze more evidence in the case and conduct a second round of testing. *Id.* at pp 97-98. The Defendant's DNA was found in the first round of testing in both cases.

Only where the jury verdict "is so contrary to the evidence as to shock one's sense of justice" should a trial court afford a defendant a new trial. The jury's verdict in this case did not shock this court's sense of justice.

**Issue III**

Defendant argues that the trial court erred in prohibiting defense counsel from cross-examining a detective from the original investigation, Detective Piree, regarding the existence and investigation into other suspects and/or victims. *See* N.T. 04/26/16 at pp. 24-110. Specifically, statements given to police by Delores Holland (N.T. 04/26/16 at pp. 49, 59-62),

28

Deatrice Terry (*Id.* at pp. 33-35, 58), Samuel Terry (*Id.* at pp. 35-36, 58), "J.C." (*Id.* at pp. 37-38, 66, 95-104); Mayvette Carter[20]; and Zetta Craig (*Id.* at pp. 62-63, 77-78, 88-93).[21]

"The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." *Com v Johnson,* 42 A.3d 1017, 1027 (Pa. 2012) (citations omitted). Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact *Com v Borovichka,* 18 A.3d 1242, 1253 (Pa Super. 2011). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Johnson,* 42 A.3d at 1027 (internal quotation marks and citation omitted).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. However, certain exceptions "have been fashioned to accommodate certain classes of hearsay that are substantially more trustworthy than hearsay in general, and thus merit exception to the hearsay rule." *Com v. Kuder,* 62 A.3d 1038, 1055 (Pa. Super. 2013) (citations omitted). Moreover, where proffered evidence in the form of an out-of-court statement contains another out-of-court declaration, both offered for the truth of the matters asserted, the proffered evidence is considered "double hearsay." *Com. v Yarris,* 731

---

[20] The record is devoid of any mention of a "Mayvette Carter" by defense counsel or the Assistant District Attorney
[21] None of these witnesses were present at trial, creating hearsay and confrontation issues

A.2d 581, 592 (Pa. 1999). "In order for double hearsay to be admissible, the reliability and trustworthiness of each declarant must be independently established. This requirement is satisfied where each statement comes within an exception to the hearsay rule." *Id*

The record reflects that the court gave defense counsel extensive leeway when she cross-examined retired Philadelphia Police Detective Jeffrey Piree regarding the hearsay statements of each of the aforementioned persons. These statements were taken during the course of the investigation by detectives other than Detective Piree. N.T. 04/26/16 at pp. 26-67. The court ruled that since this incident occurred over 27 years ago and many of those interviewed were unlocatable, the court would allow the defense some leeway in establishing that there were other leads investigated in the case and that the Defendant's name was never mentioned in the original interviews. Defense took full advantage of the court's ruling, asking question after question eliciting hearsay responses before the jury. To highlight a few examples: the jury heard of another attack against a prostitute in the bar a week prior to Ms. Hanible's murder, including the description of the assailant, which did not fit the Defendant's description. The jury heard that Ms. Hanible was having an affair with a female whose boyfriend had recently become aware of the affair by finding love letters between the two. The jury heard that a male driving around in a small black car with a Delaware tag, who had frequented that area around the time of the murders, was heard yelling out "I got three of you bitches " The jury heard that that male, Thom Eric Patterson, was brought in to homicide, questioned, and released. In fact, the line of questioning regarding persons of interest interviewed went on for over 75 pages. *Id* at pp 23-103. Counsel was not prohibited from cross-examining regarding the existence and investigation into other suspects and/or victims.

**Commonwealth v. Rudolph Churchill**
CP-51-CR-0007442-2014; CP-51-CR-0007443-2014
Opinion

### Proof of Service

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R Crim P. 114

Appellant.                      Rudolph Churchill, MM 4462
                                SCI Huntingdon
                                1100 Pike Street
                                Huntingdon, PA  16654-1112

Type of Service:  ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

Counsel.                        Gina Capuano, Esq.
                                2101 Pine Street
                                Philadelphia, PA 19103

Type of Service:  ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

District Attorney:              Philadelphia District Attorney's Office
                                Appeals Unit
                                Widener Bldg.
                                3 South Penn Square
                                Philadelphia, PA  19107

Type of Service:  ( ) Personal  ( ) First Class Mail  (x) Inter-Office

NOTE: This opinion was officially filed on November 29, 2016.  It was recently discovered that when the document was scanned by the people responsible for filing it electronically into CDMS, page 24 was missing.  This is the complete opinion.

Date: 10/06/17

Michael G. Zaleski
Law Clerk to the Honorable Rose Marie DeFino-Nastasi

## CONCLUSION

Based on the foregoing, the judgment of sentence of the trial court should be affirmed.

By the Court:

_Rose Marie DeFino-Nastasi_

Rose Marie DeFino-Nastasi, J.

Rudolph Churchill (MM4462)
CP-51-CR-0007442-2014, CP-51-CR-0007443-2014
2280 EDA 2016

NOTE: This opinion was officially filed on November 29, 2016. It was recently discovered that when the document was scanned by the people responsible for filing it electronically into CDMS, page 24 was missing. This is the complete opinion.

**Michael G. Zaleski**
Law Clerk to the Honorable Rose Marie DeFino-Nastasi
Criminal Justice Center
1301 Filbert Street, Suite 1222
Philadelphia, PA 19107
☎: 215.683.7083 🖷: 215.683.7085
✉: michael.zaleski@courts.phila.gov

10/12/17

Rudolph Churchill
CP-51-CR-7442-2014, CP-51-CR-7443-2014
2280 EDA 2016

Note: This opinion was officially filed on 11/29/16, on behalf of the Hon. Rose Marie DeFino-Nastasi, presented by the law clerk or other to the Appeals Unit for date stamp and processing. Unfortunately, the Appeals Unit was unaware the original opinion presented was missing page 24  This complete opinion will be PACFiled in its entirety.


Thank you
Penelope Graves
Appeals Unit